Next case on our docket is 22-50405, Rex Real Est. Good morning, Your Honors, Madam Chief Judge, and may it please the Court, Rex Real Estate has spent the past 35 years building, developing, and maintaining an award-winning trusted real estate brand, a brand that relies heavily on three marks, Rex, Rex Real Estate, and the crown logo. Even though the two critical issues in this case, the legal protectability of those marks and the infringement of those marks, present quintessential fact questions that require the fact finder to analyze numerous non-dispositive factors. The trial court took this case from the jury and rendered judgment before defendant Rex Real Estate Exchange called its first witness. The trial court's resolution of several fact disputes alone justifies reversal. Its legal errors, ignoring binding circuit court precedent, compel it. Taking a case away from a jury mid-trial is strong medicine, especially in a trademark case, where all of the key determinations are fact issues, and is reserved only for those facts and cases where the facts and inferences point so strongly. Yes, Your Honor. Let me ask you a question on the logo. What is your best case site for the notion that where the two logos have the same name, even if they look super different, that's enough to say you've stolen our logo? Certainly, Your Honor. I would put this court to two cases. I would point this court to this court's decision in Viacom. That was the Spongebob Krusty Krab case, where like this one, the wording was identical, and we think a jury could find that they are similar enough in the logos, but regardless of that, I think there, the Krusty Krab, the words were the same. In our case, Rex Real Estate, Rex are the same. I would also point this court to this court's decision in Extreme Lashes, where this court reversed the grant of summary judgment against the trademark owner, and there you didn't even have, you didn't even have identical words, but Judge DeMoss held that they were similar enough that a reasonable jury could have found that they were similar for purposes of both secondary meaning and likelihood of confusion, and at the very least, it couldn't be said that there was a complete absence of evidence on those points. And I think it's significant in that regard to change, and I think what your question highlights is that this court has never affirmed the grant of a Rule 50A motion in a trademark case, and it can't do so here without upending decades of binding precedent like Viacom, Extreme, and other cases. So under that precedent, this court must reverse and remand if a reasonable jury could have found, with respect to any one of the three marks at issue, that number one, it's legally protectable, and number two, Rex Real Estate Exchange infringed it, and I'll discuss each in turn. First, to be protectable, a mark must be incontestable, distinctive, or have acquired a secondary meaning that's uniquely associated with the trademark owner here, Rex Real Estate. The crown logo on which you asked about, Judge Haynes, is incontestable, as we explain in our briefs. All three marks are distinctive because each identifies the source of a particular service, like Ben & Jerry's ice cream or Dick's Sporting Goods. I'm happy to discuss either of those in more detail, but I'd like to focus today on the most straightforward path to reversal, secondary meaning, which is a quintessential fact question. So you're not relying on incontestable? We are relying on it. We set it out in our brief. Incontestability applies only to the crown logo, Your Honor, so we do rely on it. We think that is a basis for reversal, as we think inherent distinctiveness is, but just for purposes of today's argument, I want to focus on secondary meaning because it's just such a quintessential fact issue that I think it's statutory to the jury. It does not suggest that you have to have a counterclaim to be contesting that. So I understand you're trying to read the wording that way, but it's just difficult for me to read the statute that way. Well, I think, Your Honor, as a matter of practice, I think the trademark manual at ... It makes clear that it is a ... I think perhaps this is a way out of your difficulty, Judge Haynes, on the statute, is that the trademark manual makes clear that where it's the owner, where it's the owner of the mark, the owner of the mark that is involved and is bringing the action, that that doesn't qualify for purposes of the statute. Right, but when I recall the motion for summary judgment, I just don't see that that requires a counterclaim, that the statute, when it says that it's contested, requires a counterclaim as opposed to ... No, you're right, Your Honor, and I think that's where this other provision in the trademark manual comes in and resolves that difficulty by saying it's less the motion for summary judgment as who's bringing it. And if it's the owner ... We're not required to follow that TMEP. No, Your Honor. And I don't think this court needs to reach the issue of incontestability, in part because it would only apply to the crown logo, and I think we have such strong arguments on secondary. I'm happy to address those questions, Your Honor, but I think for today's purposes, I'll focus on secondary meaning, which is really a quintessential fact issue, so even if you disagree with us on incontestability, even if you disagree with us on inherent distinctiveness, we think, at minimum, a jury should decide whether there is secondary meaning here. And just to walk quickly through a few of those factors, looking at the length and manner of use of the mark, 35 years, sales volume, 400 deals worth over $2 billion since 2015 alone, advertising and print media, newspapers, including the Wall Street Journal, trade publications, billboards and signs. And I think what's perhaps most remarkable about this case is consumer evidence and testimony of actual confusion. This court has said, in many cases, that even though actual confusion is really sort of the gold standard, it's such a rare bird that you don't have to have it. And just one or two anecdotal instances can't be overlooked. And here we have a plethora of instances where Rex Exchange's ads inadvertently drove customers to Rex Real Estate's offices, often to complain about Rex Exchange's subpar service. And in Streamline, this court affirmed the denial of a Rule 50b motion in a trademark case because there wasn't a complete absence of evidence supporting the jury's finding. Because there isn't a complete absence of evidence here either. There is no way to affirm without conflicting with Streamline in other cases. And I think that's because the question here isn't whether a jury will ultimately be persuaded that Rex Real Estate's marks are protectable. It's whether there's such a complete absence of evidence on this quintessential multi-factor fact question that no reasonable jury could find that they are. And the fact and the law here simply don't permit that conclusion. Moving on to infringement. So infringement requires the plaintiff to show a likelihood of confusion. And like secondary meaning, that's a quintessential fact question determined by balancing numerous factors, none of which is depositive. And to hit just a handful, Your Honors, on the mark strength, Rex Real Estate Exchange's CEO agreed on the stand that the mark Rex is a strong mark in real estate. That's 19891 through 92 of the record. On the mark similarity, the products, the purchasers, and the advertising media, both parties are in the real estate space in a booming Texas market operating under the same name. What about their argument that real estate ain't all the same thing and your company is kind of at this level doing big properties, doing commercial properties and so forth, and they're kind of down here just doing like individual houses. And so they are quite different. I'm glad you asked me that question because I think there are two points to be made. First of all, I think that question itself is a fact question for a jury to decide. If the jury wants to decide on similarity that it thinks the evidence veers more toward my friend on the other side's view of the evidence, it can do that. What can't be done is just say that there's no evidence in this record that would permit a jury to reach the opposite conclusion. There is evidence in the record that Rex Real Estate, my client, did sell residential real estate. There are homes, there's testimony in the stand. There was the daughter's house, and then there was that other big— And again, Judge Haynes, a jury may look skeptically at that evidence on the question of persuasion, but I think even setting that aside, Your Honor, I think the fundamental question here is whether a consumer would view companies as divided, as rigidly, as my friend on the other side suggests. Here, I think the actual confusion evidence that I was talking about, where consumers were reaching out to my client, Rex Real Estate— Okay, so let's do this case site. Where is that line? If you all were selling properties and they were selling boats, would that be enough difference that it could be found as a matter of law, or can this never be found as a matter of law? No, Your Honor. I think perhaps this Court's decision in Elvis Presley Enterprises is helpful there, because there you had arguably two very different products, right? You had the Velvet Elvis Lounge in Houston, and you had Elvis Presley Enterprises with this court, actually from reversing a bench trial on this issue, on the similarity issue. And I think, again, to change even— It's a little hard for me to see Rex and Elvis Presley as the same in terms of famousness. Well, yes, Your Honor, my point isn't famousness. My point was more on the issue of similarity. And I think that's also one reason, Your Honor, why in terms of these multi-factor tests, why this Court has held that even if, you know, you don't have to have a majority of the factor. So a jury would be free, Judge Haynes, to disagree with us on the prong that we're discussing and still have ample other evidence, either on secondary meaning or on likelihood of confusion. I think, again— I guess the fact that Elvis Presley case kind of turned more on this factor of confusion that people could get confused about what they were heading into, but that by the time they learned where they were, they were already in this bar, this other place. And that's not what we have here, apparently. Apparently, you have a situation where if they call up the one place and they find out, oh, hold on a second, you're doing commercial real estate, I'm just looking to buy a house. If that occurs, then nobody's out anything, nobody's spent any money. You call up the one you're meant to call. Yes, Judge Haynes. To me, it's different from the Elvis Presley case. If I'm understanding your question correctly, I think what you're raising is the issue of diverted sale, right? That if you reach out and that confusion—I think what's valuable about Elvis Presley Enterprises is that the Chief Judge King in that case made clear it doesn't matter if later or even as they walk in, the confusion is ultimately dispelled. What matters is the creation of that initial interest and associational interest in the first place, even if it's ultimately dispelled and even if no sale is diverted. That counts under this Court's cases as confusion. I'll also point out that there were several instances of evidence in the record where customers sent letters—there was one from Illinois—complaining about Rex Real Estate Exchange's service. I don't think in those cases there was any sense of, oh, well, correcting the confusion. I think that's what's valuable about Elvis Presley Enterprises and other cases, is that even if that initial interest or associational confusion is later dispelled and even if no sale is diverted, that doesn't matter for purposes of the likelihood of confusion analysis. I see my time is running down. I've reserved time for rebuttal. Thank you, Your Honors. Thank you, Your Honors, and may it please the Court. My name is Michael Lovins, and I represent the FLE, Rex Real Estate Exchange, Incorporated. From time to time today, I may refer to my client as Rex Exchange. As a preliminary non-legal matter, my diction and lip control have not fully recovered from a jaw surgery a month ago. If at any point I'm not clear, please don't hesitate to say, I'm not sure what you said. Can you repeat that? In my presentation today—well, first of all, let me back up. The district court in this case heard all of the evidence that the appellant had the opportunity—gave them the full opportunity to put on their full case, all the evidence they wanted to put on, waited until they rested, and then rendered a directed verdict, finding that the appellant had failed to establish—to put in sufficient evidence on any of the elements of their trademark infringement claims. Not a single element did they have sufficient evidence for. And so at this point, I think it's worth pointing out what the Court is well aware of, which is Judge Pittman could have been wrong as to all of those elements except one, and his judgment should still be affirmed. And that's, of course, the obvious reason is the plaintiff has the burden on every element, and their failure on any of them is fatal to their entire case. I'd like to highlight two main points—of course, there are many points, but the two I'd like to highlight the most are, did the appellant actually have anything protectable at all? And I think the answer is no, as Judge Pittman found. And the second is the likelihood of confusion in the eight digits analysis that Judge Pittman went through quite carefully. And I think the importance of that is more in its illustrative effect, because it illustrates that we have here two very, very different companies that do very different things, that seek to serve very different customers. And Judge Haynes is— Well, then why didn't you address the Elvis Presley case? It's not even in your brief. And the Viacom case, which they talk about forever, is only mentioned in passing, and it's not addressed at all. So why did you not address the two cases they relied on hugely in your brief? Well, Your Honor, perhaps we should have addressed the more—the Elvis Presley case, and I think Judge Graves, you brought this up, that's a vastly different case. And it emphasizes that the eight digits of confusion are not separate silos to be considered in isolation. In fact, they're more like strings that are intertwined. And so part of that is the court can—well, the strength of the mark is key to all of the factors. And here, the evidence is very clear. Almost nobody knows who Appellant is. The only ones who know who Appellant is, for the most part, are his customers who he entertains at AT&T Stadium in his luxury suite, and I don't say that as a criticism. God bless him for being able to do it. And at a dove hunt that is exclusively for invited guests. It's not to the general public. This is a vastly different situation from Elvis Presley, who's one of the most famous people literally in the history of the world. So to compare Rex Glyndening of Rex Real Estate, one LP, to Elvis Presley, I think it's such an apples-and-oranges case that it doesn't really have any applicability here. I think— Very calm. Again— You didn't distinguish. You just cited it in passing. Again, and I'm not really the target market for that case, but it's the Spongebob Squarepants Krusty Krab restaurant. It's a widely known thing, and so the chance of there being confusion there is significant because so many people know what the Krusty Krab restaurant is. I'll reiterate the point. I didn't until we got that case. And I didn't either, Your Honor. But we probably all knew Elvis Presley. We all knew Elvis Presley. Not personally. And there was a lot of evidence in the record that showed just how famous the Krusty Krab is. But, you know, that's why your opponent keeps saying, okay, maybe we'll lose to the jury, but that's for the jury to decide. For the exact reason that you all just discussed, that Krusty Krab isn't something necessarily everybody knows, but maybe is better known than Rex. But the level of known—okay, so Elvis Presley is up here, Krusty Krab is maybe here, and then Rex maybe, I think, is below that. But isn't that something for a jury to analyze, and wouldn't that be a great closing argument for you to make? Hey, he ain't Elvis Presley. If there's evidence, yes. But here the evidence was actually clear, and Judge Pittman looked at it carefully, and he said, this is the kind of case where the facts are sufficiently clear that the law requires a particular result. Now, that's my language I'm quoting from the U.S. Supreme Court 2002 Weisgrund v. Marley interpreting Rule 50. So, the standard is not, is there any evidence at all that maybe someday some jury could possibly find that? The question is, do the facts compel a particular result? Could a reasonable jury have found that there is secondary meaning or that there is a likelihood of confusion? And, again, this likelihood of confusion shows, when you start looking at these elements, it shows just how, no, a reasonable jury can't look at that and say there's a likelihood of confusion. And the appellant failed to put in evidence to support that. They could have done a consumer survey, which, of course, this Court has said several times, is that's what's really preferred on these, is a consumer survey showing secondary meaning. They could have tried to do that, and they didn't do that. They didn't attempt to. And when you look at the other factors of secondary meaning, my opponent referenced the volume of sales. Yes, they're a large dollar figure of sales, but it's, they're on such, they're large transactions, so what the evidence has to show is not, is it a lot of money? It's, did that lot of money penetrate the mind of the public? Because the mind of the public is where secondary meaning lies, not the mind of the appellant. So the district court went through and established long-standing precedent, well-settled law, and on that eight digits of confusion, the, Judge Haynes, kind of back to your point, why didn't we address Elvis Presley more clearly? Perhaps we should have. Well, you didn't address it at all. It wasn't unclear. It was not even cited. And I want to bring up the case that the appellant didn't cite, which is the Springboards to Education case, which is the one where Springboards to Education had a millionaire readers club, and then Houston ISD started their own millionaire readers club. Same basic words. They did the same thing. They essentially, the end user, the students, were the same. Now, that's not quite the same as the consumer, because the end user, the students weren't, they weren't buying into this, that was the education establishments. But this court actually looked at the eight digits of confusion, and in doing so, it found not that all of them weighed in favor of the defendant, but that four of them weighed in favor of the defendant, three of them weighed slightly in favor of the plaintiff, and one was neutral. Now, it's not just a straight tally, I understand that, and I don't mean to make that claim, but this case is, the Springboards case is about as precisely on point for our case as can be. Words that are very similar, perhaps even identical, and even in that case, this court analyzed those factors and said, there's not a sufficient fact issue to get this to a jury. I believe that was a summary judgment case, but the standards for Rule 50 and Rule 56 are not exactly the same. Actually, I think it's a little better for us on Rule 50 than Rule 56, but they're close enough that it's certainly analogous. With regard to the incontestability, and this is part of whether they owned anything at all, Judge Haynes, you're almost reading my notes on the reading of the statute, I'm sorry. Yeah. Because the statute specifically says, they have to sign an affidavit, there is no proceeding involving said rights pending in a court. I've eliminated the language, it doesn't really apply here. And they cite to the TMEP to say, well, if there's no counterclaim, then you don't have to disclose that. Fair enough. But you don't even have to say the TMEP is wrong in order to say, well, that doesn't address the issue of a summary judgment, because that's clearly a proceeding. I think if the statute is clear, we don't look elsewhere for help with it. It's only when the statute's ambiguous that we look to help with it. I agree with that, Your Honor, and I don't think the statute's ambiguous, and I don't, my point here is not that we need the TMEP, but you don't have to say, you don't have to say the TMEP is wrong to say that a summary judgment claim has to be disclosed in an incontestability affidavit. And furthermore, the incontestability affidavit, and this kind of goes to the whole thing of, does the appellant own anything at all? The evidence was abundantly clear that the first use of the mark by anyone on the appellant's side was by Rex and Cherise Glyndenning before they created any entities at all. Subsequent to that, they created Rex Real Estate, Incorporated, I believe, they continued to use the mark. Subsequent to that, they created the appellant, Rex Real Estate 1LP. There's no evidence in the record whatsoever that at any point the ones who actually owned the marks, which is Rex Glyndenning, made any sort of assignment to either of these entities, most importantly. What's your best case side for the proposition that when they're all connected, it's not some stranger that owned it, that they have to have physically assigned it for it to be in the hands of the LP? Well, Your Honor, the statute itself says that it must be the owner who applies for registration. In their reply brief, and I'm glad I get a chance to bring this up because I didn't get a chance to respond to their reply brief, they cite the TMEP again to say that related companies, the use of related companies in order to the benefit of the owner. Fair enough. I don't disagree with that, but that doesn't change the fact that the registrant has to be the owner, not the related company. And I think when you look at even the TMEP, it's abundantly clear that it is not saying that a related company can be the one that seeks registration or the incontestability. And the incontestability affidavit has to be filed by the owner of the mark as well. So that comes, Your Honor, straight from the statute, that it has to be the owner, not a related company or a related user. So they didn't have anything. Rex Real Estate, one LP, who's actually the appellant, the party before the court, owns nothing. I think, and I'll make this final point, and then if there are no other questions, I'll yield back the balance of my time. These are two very different companies. To say that they're both in the same business is sort of like saying that a lawyer who will help you when you've got a speeding ticket and a lawyer who will help you when you need to prosecute a pharmaceutical patent at the PTO, they're both in the legal business. Okay, fair enough, but they're not in the same business in any meaningful way. And what it all comes down to is what is the evidence before the court? The likelihood of confusion and the secondary meaning, it has to be in the mind of the public, not in the mind of Mr. Glendening. And I said I was going to make one more point, and then I removed it. So you're saying it's sort of like a doctor who does heart surgery versus a doctor who fixes your leg? A little bit, except... That's different? Too different? I think it's even more dramatic than that, because, again, I'm not trying to introduce some sort of class warfare thing here, but Mr. Glendening and Rex Real Estate One LP, they serve very high-end, very wealthy customers. Rex Exchange serves middle-class folks buying and selling almost exclusively their primary residence. Average transaction, total transaction, not Rex Exchange's fee, total transaction is somewhere in the mid-300s. Does it matter that it seems like the confusion, if there was it, was people wanting to call exchange and instead calling Rex Real Estate? Doesn't that help them, and does that matter, or is that solely a jury issue? No, Your Honor. In fact, the evidence that they showed of supposed actual confusion is all the wrong sort of evidence, because it is exactly what you said. It's people who are looking for my client and called them, which is the opposite of what they need to show, because that doesn't show any possible harm to the appellant. Is there any indication that somebody who wanted to buy commercial real estate ended up doing it from you all, or ended up calling you all and then doing business with you all? Absolutely not. Is that required, though? Yes. Because they say you don't need that evidence. I think there were two calls, and you all said, no, call Rex Real Estate. They were. So first of all, I agree that they don't have to show that that absolutely happened in order to show actual confusion. But they have to show that it's probable, not merely that it speculatively could happen. And furthermore, when somebody contacts Rex Exchange and says, I want to buy a commercial investment property, even if Rex Exchange had no idea who the appellant was, they wouldn't be able to help them. That's not what they do. I shouldn't say they wouldn't be able to. It's certainly not, that's not what they, and the evidence was clear in the record. We don't do large commercial investment properties. So what evidence would they have to put on, because you said it doesn't have to actually happen, but you're saying they do need evidence that people could end up using Rex Exchange when they really meant Rex Real Estate. What would they have to show on that that they didn't show? Well, they would have to show, first of all, that in the mind of the public, somebody actually knows who the appellant is in order to possibly be confused. If nobody knows who it is, how can they be confused? Second of all, I think actually the point goes to the, if not impossibility, near impossibility of them actually showing the actual confusion that they need. Because in just the same way, if I'm a traffic ticket lawyer and somebody comes to me and says, hey, I need a patent prosecuted through the PTO, my head's going to spin. I'm going to say, I don't have any idea how to do that. That's not my thing. And so it wouldn't be possible as a practical matter for someone to come to a traffic ticket lawyer and be confused into getting a patent prosecution from them. In the same way, the evidence showed and compelled the legal result that Judge Pittman reached that no one could come to Rex Exchange seeking what the appellant provided. Now, but if both groups were selling all kinds of real estate, y'all were selling commercial and residential, and they were selling commercial and residential, that would be different. Absolutely would be different, Your Honor. So that's your point? Yes. Because there's also this discussion of some other companies that maybe y'all are having problems with, but those are selling everything, right? I don't believe the record showed. There's several other Rex real estates or people named Rex who are in real estate and sort of use that phrase, and there's a bunch of them in Texas. The evidence didn't really show what they did. It just shows that they're out there. Okay. But I'm saying I thought you all had some lawsuits with others. There is a totally unrelated lawsuit with the National Association of Realtors and Zillow. It's an antitrust lawsuit, which goes to Rex Exchange is essentially upending the realtor market by using AI and technology and the Internet to take that 6% that everybody pays when they buy or sell a house, to take that down dramatically because they kind of, it's a high-tech, low-tech. The online selling of houses. A little bit. Help me, and I may be way off base, but in Viacom, Viacom had the trademark for Krusty Crab, which was an imaginary restaurant. You couldn't go to Viacom and get a meal. I mean, it was totally apples and oranges. But I think it's the affiliation and sponsorship there because they, well, you couldn't. The test isn't whether they're in the same business. That's my whole point. It's not whether they're in the same business. It's not exactly whether they're in the same business, but when a mark is as weak as the appellant's mark and nobody really knows who it is. That's a different thing. That's not the same as saying, well, you do this kind of real estate versus you do that kind of real estate. The question is, does the mark have enough recognition in the public's mind? It has nothing to do with how different the businesses are, necessarily. If we look at these as separated silos, but I think that they're interconnected, so if nobody knew what the Krusty Crab was, I think that that would be a much more important fact that they're in a different business. If you have a really, really strong mark that's penetrated the mind of the public very powerfully like the Krusty Crab, not 100%, you and I didn't know what it was, but a large percentage of the population does, enough that they might be influenced to go to this actual Krusty Crab restaurant and think, oh, this is the Spongebob thing, but nobody could, if there's not, if the mind of the public doesn't think that, then they can't really do that. My time is, I've only got 30 seconds left. If there are no more questions, we ask that the court affirm Judge Pittman's directed verdict. Thank you. Thank you, Your Honors. Just three brief points. First, I'd like to begin with what I didn't hear from my friend on the other side, and that's any instance in which this court has affirmed the grant of a Rule 50A motion in the trademark context, and that's because there is none, and for very good reason. The two critical issues here, protectability with secondary meaning and infringement and to assess numerous non-dispositive, non-exclusive factors, and there's simply no way to square the grant of JMOL here as a matter of law with this court's cases, as we've discussed at length today. Second, my friend on the other side spent a lot of time. I'm sorry, why didn't you distinguish springboards in your reply? Oh, certainly, Your Honor. I'm happy to do so now. I think that springboards is worlds apart from this case on a couple of points. For one thing, you weren't dealing with identical marks here as you are there. The evidence of sales there was completely different, much lower than here, and there were zero instances of actual confusion there. Now, of course, this court has said it isn't necessary, but I think that's a very striking difference here. So we think . . . we have no quarrel with springboards. I think it was absolutely correctly decided it's just worlds apart from this case. And again, my friend on the other side spent a lot of time discussing the differences in ways the two companies operate and the markets that they purport to serve. He also placed great weight on the absence of a particular survey. All of that, Your Honors, is beside the point. In a case like this one, it doesn't matter what the company's intended for consumers to think, and it doesn't matter what hypothetical consumers in a survey might have answered. What matters is that we put before the jury a plethora of instances of actual consumer confusion, which goes to the heart of the question on both protectability and secondary meaning. And let me address directly my friend's argument about . . . and I think he highlighted one of the most serious errors of law that the district court committed here, and that was ignoring virtually all of the compelling actual confusion evidence by limiting it to examples of Rex Real Estate's consumers going to Rex Real Estate Exchange. But that legal error runs afoul of this Court's cases in two ways. First, just taking it on its own terms, let's say that was the only evidence offered, those two instances where consumers went to Rex Real Estate Exchange. What the district court did violated Streamline's command that courts may not ignore competent evidence of actual confusion even if the anecdotes are minor and isolated, and that's a Quote 851F3 at 457. So even the handful of examples the trial court did consider would clear this Court's what it's called, it's a low bar for evidence of actual confusion. And I think second, and even more fundamentally, this Court held in Elvis Presley Enterprises that evidence of actual confusion can't be limited like the district court did. So I think either way, the district court fundamentally erred in limiting the evidence of . . . You're saying you had a lot more instances that you would have offered, but for . . . No, we did, Your Honor, we did offer them. The district court said, I'm not going to consider this evidence where consumers called Rex Real Estate, my client, responding to advertisements by Rex Real Estate Exchange, which sort of undercuts the argument about nobody knows who my client is. They certainly were able to find my client again and again and again to complain about Rex Real Estate Service. And third harm, just briefly, in its briefing, Rex Exchange all but concedes that we're entitled to an injunction if we can show that our marks are protectable and likelihood of confusion that those are jury issues. You know, in closing, let me just wrap up, Your Honors, and say the district court took this case from the jury mid-trial, resolved multiple fact issues itself . . . Can you address the ownership issue? Certainly, certainly, Your Honor. I think it . . . most fundamentally . . . and I see my time has expired, if I may respond. We need an answer to that. Thank you, Your Honor. I think the ownership issue is really a red herring here, and Your Honor, I think the fundamental question is whether the entity asserting the mark is the entity the public recognizes as offering the goods and services. And I think here there's no question the evidence supports that. We know in trademark, you don't even have to register a mark. In trademark, ownership is established by use. And there's no question here that the Glendennings used the mark for years before incorporating in 1991. They maintained control over the mark while their business was a corporation from 1991 to 1998. And they have controlled use of the marks since 1988 when they formed the current LLC that owns and operates it today. So we think the ownership issue is a complete red herring. And if there are no further questions, thank you, Your Honors. The Court will take a brief recess.